165 P.3d 693

**STATE of Arizona, Appellee,**

v.

**Peter SHARMA, Appellant.**

**No. 1 CA–CR 06–0062.**

Court of Appeals of Arizona, Division 1, Department B.

Aug. 30, 2007.

Terry Goddard, Attorney General by Randall M. Howe, Chief Counsel, Criminal Appeals Section and Joseph T. Maziarz, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James Haas, Maricopa County Public Defender by Stephen J. Whelihan, Deputy Public Defender, Phoenix, Attorneys for Appellant.

## OPINION

WEISBERG, Judge.

¶ 1 Peter Sharma ("defendant") was convicted of unlawful possession of an access device, theft by material misrepresentation, and taking the identity of another. On appeal, he contends that insufficient evidence supported the convictions for unlawful possession of an access device and for theft. He also argues that the trial court erred in using his prior federal felony convictions for sentence enhancement purposes. We hold that lack of intent to permanently deprive another of property acquired by misrepresentation is not a defense to the theft charge, but we further hold that the evidence did not support the conviction for unlawful possession of

an access device, and that defendant's prior convictions were improperly used to enhance his sentence. Accordingly, we reverse the latter conviction and remand for resentencing.

## BACKGROUND

¶ 2 In 1988, defendant pled guilty in federal court to five counts of aiding and assisting in the preparation and presentation of false documents. He was sentenced to prison terms totaling five years on two of the counts, to be followed by five years of probation on the three remaining counts. After failing to report to prison as scheduled in February 1989, defendant lived as a fugitive and used the name "Peter Reynolds" until being taken into custody in May 1996. In March 1997, he also pled guilty to one count of failure to self-surrender and was ordered to serve an additional eighteen months.

¶ 3 Defendant was released from federal custody in December 2000 and began a five-year probationary period. He used his given name to obtain employment, but after encountering difficulty renting an apartment and because he had a good credit history as Peter Reynolds, in 2001 he began using the latter name. He also used a social security number comprised of the same numbers as his own but in altered order[1] to open bank accounts, obtain credit cards, and contract for utility services, including cable television service from Cox Communications. The scrambled social security number in fact belongs to another person.

¶ 4 After investigators learned of defendant's use of the fictitious identity, police conducted a search of his home. Officers found various documents and access devices, including a Florida driver's license, credit and debit cards, checks, and a counterfeit social security card, all bearing the name Peter Reynolds. Although defendant had generally paid all bills and obligations as they came due, his Cox Communications account had a balance of approximately $250 that had not been timely paid after the bank

froze his account as a result of the fraud investigation.

¶ 5 Defendant was charged with taking the identity of another, a class 4 felony; unlawful possession of an access device, a class 5 felony; and theft, a class 6 felony. The State also alleged the federal felony convictions as historical priors and that defendant had committed the instant offenses while on probation. A jury found defendant guilty on all counts as charged. The court sentenced him as a repetitive offender to concurrent, mandatory, presumptive prison terms, the longest of which was ten years for identity theft. But, the court also found the mandatory sentences clearly excessive under the circumstances and entered an order asking that the Board of Clemency reduce the sentences to not more than two years.

¶ 6 Defendant filed a timely notice of appeal. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) sections 12–120.21(A)(1)(2003) and 13–4033(A)(1)(2001).

## DISCUSSION

¶ 7 We turn first to defendant's arguments that insufficient evidence existed to convict him on the charges of theft by material misrepresentation and of unlawful possession of an access device. Our review of the sufficiency of evidence is limited to whether substantial evidence supports the verdict. *State v. Scott,* 177 Ariz. 131, 138, 865 P.2d 792, 799 (1993); *see also* Ariz. R.Crim. P. 20(a). Substantial evidence is such proof that "reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Mathers,* 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990) (quoting *State v. Jones,* 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980)). "Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction." *State v. Soto–Fong,* 187 Ariz. 186, 200, 928 P.2d 610, 624 (1996).

---

1. Defendant testified that the social security number he used as Peter Reynolds was the employee identification number he had received

from an employer in 1989 and was a scrambled version of his own social security number.

**Theft Charge**

■ ¶ 8 Defendant was charged with theft by material misrepresentation in obtaining service or property from Cox Communications. To convict him of this charge, the State had to prove that without lawful authority defendant had knowingly obtained services or property from Cox through a material misrepresentation and with the intent to deprive Cox of those services or property. *See* A.R.S. § 13–1802(A)(3)(Supp.2006). Defendant concedes that he committed misrepresentation in obtaining cable service under a fictitious name but argues that no evidence showed any "intent to deprive" Cox of anything because he intended to pay for the service as demonstrated by his regular pre-arrest payments to Cox.

■ ¶ 9 Defendant's argument, however, incorrectly assumes that A.R.S. § 13–1802(A)(3) permits a person to obtain services or property by misrepresentation as long as the person intends to compensate the victim for the services or property obtained. To the contrary, a victim need not suffer financial loss in order for theft by misrepresentation to occur. *State v. Jahns,* 133 Ariz. 562, 565, 653 P.2d 19, 22 (App.1982). We agree with our supreme court in their discussion of the predecessor statute for theft by false pretense, our supreme court held that "[o]nce the victim has parted with his property in reliance on a false representation, it is immaterial whether whatever he got in return is equal in exchange value to that with which he parted." *Id.* (quoting *State v. Mills,* 96 Ariz. 377, 381, 396 P.2d 5, 8 (1964)). Thus, the State was not obligated to prove defendant intended to permanently deprive Cox of the property or services, *State v. Agnew,* 132 Ariz. 567, 575, 647 P.2d 1165, 1173 (App.1982), and his intent to pay for the services he had procured by misrepresentation does not constitute a valid defense. *Mills,* 96 Ariz. at 380, 396 P.2d at 7.

¶ 10 The evidence at trial indicated that, due to his less than favorable credit history, defendant began using the name Peter Reynolds to obtain services from companies like Cox without having to make an advance deposit. By misrepresenting his identity, and hence his creditworthiness, defendant was able to receive cable service on terms under which he knew he otherwise would not qualify, i.e., without having to meet the deposit requirement. And even if Cox did not initially suffer any financial loss because defendant paid his bills as they came due, a balance of approximately $250 was not timely paid when his bank froze his account as a result of the police investigation. Therefore, defendant obtained cable service and intentionally deprived Cox of its service by misrepresentation, and Cox suffered a financial loss when defendant ultimately was unable to pay for a portion of the service he had wrongfully obtained. Accordingly, the evidence was sufficient to support defendant's conviction for theft by material misrepresentation.

**Unlawful Possession of Access Devices**

■ ¶ 11 Defendant was charged with knowingly possessing more than five but less than one hundred access devices in violation of A.R.S. § 13–2316.01 (2001). He argues on appeal that the trial court misinterpreted § 13–2316.01(A) and that the evidence does not support his conviction.

¶ 12 One commits unlawful possession of access devices "by knowingly possessing, trafficking in, publishing or controlling an access device without the consent of the issuer, owner or authorized user and with the intent to use or distribute that access device." A.R.S. § 13–2316.01(A). "[W]ithout the consent of the issuer, owner or authorized user" is not defined or explained. An "access device" is defined as

> any card, token, code, account number, electronic serial number, mobile or personal identification number, password, encryption key, biometric identifier or other means of account access, including a cancelled or revoked access device, that can be used alone or in conjunction with another access device to obtain money, goods, services, computer or network access or any other thing of value or that can be used to initiate a transfer of any thing of value.

A.R.S. § 13–2301(E)(2)(Supp.2006).

¶ 13 Defendant contends that the evidence was fatally insufficient because although he

used an alias, he was both the owner and the authorized user of all of the access devices found in his possession. Accordingly, he argues, the State failed to prove that his possession of the devices was without consent of the owner and the authorized user. The State responds, however, that the statute is written in the disjunctive and thus describes three circumstances under which one may violate the statute, one of which is by possessing access devices without the *issuer's* consent. Because several issuers testified that they would not have opened accounts and issued access devices if they had known that defendant was not using his true name, the State contends that sufficient evidence supports the conviction.

■ ¶ 14 Proper construction of a statute presents a question of law subject to *de novo* review. *State v. Stroud,* 209 Ariz. 410, 414, ¶ 18, 103 P.3d 912, 916 (2005). In construing a statute, our primary goal is to give effect to the intent of the legislature. *Zamora v. Reinstein,* 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996). We normally begin with the statute's plain language, *State v. Tschilar,* 200 Ariz. 427, 434, ¶ 25, 27 P.3d 331, 338 (App.2001), and give words their ordinary meaning unless the context or circumstances indicate that the legislature intended a different meaning. *State v. Korovkin,* 202 Ariz. 493, 497, ¶ 15, 47 P.3d 1131, 1135 (App.2002); *State v. Tiscareno,* 190 Ariz. 542, 543, 950 P.2d 1163 1164 (App.1997).

¶ 15 The ordinary meaning of consent is "permission, approval, or agreement; compliance; acquiescence." *Random House Webster's College Dictionary 2891* (1995). *Korovkin,* 202 Ariz. at 497, ¶ 15, 47 P.3d at 1135 (to find a word's "ordinary meaning," we may rely on a dictionary definition). Thus, "without consent" would generally mean without agreement or permission.

¶ 16 Attributing the ordinary meaning to "without consent," however, does not substantially advance our interpretation of the statute. But, when statutory terms are undefined and are subject to alternative interpretations, to determine the legislature's intent, we may consider such things as the statute's underlying policy, historical background, context, and the evil it was designed

to correct or prevent. *Moreno v. Jones,* 213 Ariz. 94, 98, ¶ 24, 139 P.3d 612, 616 (2006).

¶ 17 The legislative history reveals that § 13–2316.01 and related statutes were enacted to modernize the criminal code in light of the increased use of computer technology and to impose sanctions for improper use of such technology. The "Fact Sheet" accompanying H.B. 2428 reveals that the bill was directed at "the use of computer technology and the Internet in crimes related to fraud, identity theft, unauthorized access into computer systems, the dissemination of proprietary and security information[,] and sex crimes." (H.B.2428, 44th Legis.Sess.(Ariz.2000).) The bill was designed to create new offenses, including "the unlawful possession of an access device and the unauthorized release of proprietary information." *Id.* In describing the former offense, the fact sheet stated that the bill would prohibit *"the knowing possession,* trafficking, publication or controlling *of another's access device with the intent to use it." Id.* (emphasis added).

¶ 18 As enacted, however, § 13–2316.01 does not state that it bars knowing possession of *another person's* access device but rather simply bans possession of an access device "without the consent of the issuer, owner or authorized user and with the intent to use or distribute [it]." Thus, the statute does not expressly say that it prohibits possession of access devices that belong to another person.

¶ 19 We note, however, that when the legislature proposed these new offenses, it broadened the definition of "personal identifying information" in A.R.S. § 13–2001(9) (2001) to include access devices, electronic identifiers, and screen names. It also barred knowing use of "any personal identifying information of another person, without the consent of that other person, with intent to obtain or use the other person's identity *for any unlawful purpose or to cause loss to a person."* A.R.S. § 13–2008(A) (2001) (emphasis added). A fair interpretation of the legislature's purpose is that it intended to punish those who use *another person's* access device or personal information for an unlawful purpose (i.e., to cause harm or loss to the

person to whom the access device has been issued or provided).

¶ 20 The instant case does not fall within the typical situation in which a defendant possesses the access devices issued to or belonging to another individual without that person's consent but with intent to use them to cause a loss or harm. Rather, defendant possessed a driver's license, checks, and bank cards issued in the name of an alias, and the evidence showed that he had only used the checks and bank cards to access his own money in bank accounts he had opened using the alias. Although he may have obtained or opened the bank accounts by representing himself as Peter Reynolds, he had not stolen any of the cards or checks, and none of the cards or checks belonged to a separate person named Peter Reynolds. Thus, even though the name "Peter Sharma" did not appear on the devices, defendant was not in possession of devices belonging to another person with the intent to use the devices to access accounts belonging to that other person and to cause any harm or loss.

¶ 21 In this case, no evidence showed that defendant ever used the bank cards or checks in his possession to obtain property or services without paying for such property or services or to access accounts belonging to anyone but himself. Instead, the evidence showed that he intended to be bound for the goods and services he obtained and in fact in the past had used the devices to access his own accounts and to obtain goods and services for which he routinely paid.

¶ 22 The State nevertheless argues that the issuers of the checks and bank cards would not have consented to providing these access devices to defendant if they had known he was Peter Sharma and thus he held them without the issuers' consent. But we are unpersuaded that the reference to "without consent" intended anything more than to prohibit one from possessing, with an intent to use them, stolen or forged bank cards, checks, or other access devices. Here, the issuers had voluntarily and through their routine business practices provided defendant with an appropriate device to gain access to his own account. Furthermore, de-

fendant used the devices, as the issuers had intended, to access his own accounts. If we accept the State's argument, the issuers' mistaken belief about defendant's true identity transformed their voluntary and routine provision of the access devices either into involuntary provision of the devices or a revocation of their consent that he possess the devices. The State points to no statutory language, history, or goal to support such a construction.

¶ 23 An additional consideration persuades us that the legislature did not intend to outlaw possession of access devices unless the owner *and* the authorized user *and* the issuer all consented to such possession. For example, if a man allowed his cousin to use his credit card to purchase goods or services because of his cousin's youth or poor credit history, the cousin would knowingly possess the card with the owner's and authorized user's consent and with intent to use the card, but he also would be in possession of the card without the issuer's explicit consent. We do not think the legislature intended to sweep within the reach of § 13–2316.01 the cousin's authorized possession and intent to use the card. The State's interpretation would cut an unnecessarily wide swath and criminalize perfectly innocent or legitimate possession of access devices without achieving any law enforcement purpose.

¶ 24 The banks that issued the access devices to defendant did so in order for him to use the devices and to gain access to the very accounts he had opened or owned. Because the evidence does not support a finding that defendant possessed the access devices "without the consent of the issuer, owner, or authorized user," we reverse the conviction for unlawful possession of access devices.

**Sentence Enhancement**

¶ 25 Defendant also argues that the trial court improperly enhanced his sentences by using two prior federal convictions that do not fall within the time limits of former A.R.S. § 13–604(V)(2)(Supp.2006).[2] In addition, he contends that his federal conviction for aiding and assisting in the prepa-

2. This subsection has since been amended and renumbered as A.R.S. § 13–604(W)(2).

ration and presentation of false documents does not qualify as a "historical prior felony conviction" because it does not constitute a felony under Arizona law.[3] *See* A.R.S. § 13–604(N) (2001)(one convicted of an offense committed in another jurisdiction is subject to enhanced penalties if the crime "would be punishable as a felony" in Arizona). Because we conclude that the two federal convictions do not qualify as historical prior felony convictions under A.R.S. § 13–604(V)(2), we need not address the latter argument.

¶ 26 Due to defendant's two prior federal convictions, the trial court sentenced him as a repetitive offender under A.R.S. § 13–604(C) (2001). The court did so because it concluded that the time defendant had spent as a fugitive should be excluded in determining whether these convictions qualified as historical priors.

¶ 27 A prior felony conviction may qualify as a historical prior felony conviction if committed within the ten years (a class 2 or 3 felony) or the five years (a class 4, 5, or 6 felony) immediately preceding the date of the present offense. Although the five- or ten-year period excludes time spent "incarcerated" and "on absconder status while on probation," A.R.S. § 13–604(V)(2)(b) and (c), there is no exclusion of time spent as a "fugitive." *See id.* ("If a court determines a person was not on absconder status while on probation that time is not excluded."). Thus, the court erred in excluding the seven years defendant spent as a fugitive after failing to surrender to federal authorities in 1989.

¶ 28 The record establishes that defendant spent roughly three and one-half years incarcerated after he committed the federal offenses and before he committed the instant offenses. Even after excluding the time he was incarcerated, defendant's two federal offenses still precede the present offenses by periods of more than sixteen and eleven years respectively. Therefore, neither of the federal convictions qualify as a historical prior felony conviction under A.R.S. § 13–604(V)(2)(b),(c).

¶ 29 The State, however, argues instead that the court properly could have enhanced defendant's sentences under A.R.S. § 13–604(V)(2)(a)(i). This statute allows a sentencing court to treat felony convictions for certain types of offenses as historical prior felony convictions without any time restrictions. For example, a conviction that "[m]andated a term of imprisonment except for a violation of chapter 34 of this title involving a drug below the threshold amount," A.R.S. § 13–604(V)(2)(a)(i), is one such offense. Thus, a conviction that requires a *mandatory* prison term (except minor drug offenses) can be used for sentence enhancement purposes irrespective of its age. *Zamora*, 185 Ariz. at 276, 915 P.2d at 1231.

¶ 30 But, the State provides no authority for its contention that defendant's prior convictions fall within the scope of § 13–604(V)(2)(a)(i). He was convicted of violations of 26 U.S.C. § 7206(2) (false documents) and 18 U.S.C. § 3146 (failure to surrender). Neither statute requires imprisonment as a penalty. *See United States v. Waldman*, 941 F.2d 1544, 1547 (11th Cir.1991) (probation granted for violation of 26 U.S.C. § 7206(2)); *United States v. Queen*, 847 F.2d 346, 348 (7th Cir.1988) (probation granted for failure to surrender). Indeed, defendant was placed on probation in connection with three of the five federal counts. Therefore, A.R.S. § 13–604(V)(2)(a)(i) is not a valid basis for sentencing defendant as a repetitive offender.

¶ 31 Because defendant's federal convictions were committed more than ten years prior to the present offenses and do not qualify as historical prior felony convictions under our sentencing laws, the trial court erred in imposing enhanced sentences under A.R.S. § 13–604(C).

## CONCLUSION

¶ 32 Defendant has not appealed from his conviction for identity theft, and we affirm

---

**3.** Although defendant pled guilty to five counts of this offense, because they were committed on the same occasion, the convictions only count as one historical prior for enhancement purposes. A.R.S. § 13–604(M) (2001).

that conviction. Also, for the reasons stated, we affirm his conviction for theft by material misrepresentation. We reverse, however, the conviction for possession of an access device, and we vacate defendant's sentences imposed due to the trial court's use of non-qualifying prior convictions for enhancement purposes. We remand for resentencing.

CONCURRING: MAURICE PORTLEY, Presiding Judge, and PATRICK IRVINE, Presiding Judge.